FILED
MAY 30 2019
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-MJ-254 |
| | ) | |
| LISA DAWN RAMIREZ, | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

**I. INTRODUCTION**

I, Jason Coe, being duly sworn, state:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since 2017. From 2017 to present, I have been assigned to a white-collar crime squad at the Washington Field Office that focuses specifically on the investigation of health-care crimes, including health-care fraud and other health-care crimes. My particular investigative focus during the past year has been on the illegal distribution and diversion of prescription drugs. During this time, I have executed multiple search and arrest warrants related to prescription drug distribution investigations. I also have attended law-enforcement training programs focused on prescription-drug crimes.

2. This affidavit is made in support of a criminal complaint charging LISA DAWN RAMIREZ ("RAMIREZ") with conspiracy to distribute, and distribution of, hydromorphone, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

3. The facts and information contained in this affidavit are based on my personal knowledge of the investigation, the observations and reports of other law-enforcement officers, and information from confidential sources. This affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts which are necessary to establish that probable cause exists.

4. Based on my training and experience, review of medical guidance and information relayed to me by other agents who specialize in the investigation of prescription drug trafficking, I know certain types of prescription drugs are often abused by users seeking the "high," the "rush," or the state of euphoria they produce. Hydromorphone — which in its brand-name form is known as Dilaudid, Exalgo, and Palladone — is a commercially available, pharmaceutical narcotic analgesic that is used to treat moderate to severe pain. Hydromorphone is available only by prescription written by a licensed medical practitioner acting in the usual course of his or her professional practice. Hydromorphone is classified as a Schedule II controlled substance by the Drug Enforcement Administration ("DEA"). A Schedule II controlled substance is one that has a high likelihood of causing severe psychological and physical dependence in users and has a high potential for abuse. Hydromorphone comes in both tablet and capsule form, in various dosage strengths.

5. When abused, Hydromorphone may be taken in excess; crushed and snorted; crushed, dissolved, and injected intravenously; or crushed and smoked. Hydromorphone pills frequently are sold illegally by individuals who obtain them by prescription or otherwise, with the street value of these pills being approximately $2 to $3 per milligram ("mg"). When sold in smaller

quantities, hydromorphone 4-mg tablets typically can be sold on the street for approximately $12 per tablet. When sold in larger quantities, hydromorphone 4-mg tablets often sell for $8 per tablet. Hydromorphone tablets are sometimes referred to as "Ds," usually to include the dosage, i.e. a 2 milligram hydromorphone tablet would be a "D2," and a 4 milligram hydromorphone tablet would be a "D4."

6. Hydromorphone is often abused along with other prescription and/or illicit drugs. Based on my training and experience, hydromorphone is abused by drug addicts in various ways to achieve a heroin-like high. In fact, when abusers of hydromorphone are unable to obtain hydromorphone, they often turn to using heroin to achieve a similar high or to alleviate withdrawal symptoms.

7. Additionally, as a result of my training and experience, I know that the Prescription Drug Monitoring Programs (PDMP) consist of statewide electronic databases that collect designated data on prescription controlled substances dispensed within the individual states. In the Commonwealth of Virginia, the PDMP is known as the Prescription Monitoring Program (PMP). The PMP collects prescription data from pharmacies for Schedule II through IV controlled substances. As such, the accuracy of the information depends on the correct input of the information by the pharmacies. In my experience, the information entered into the PMP is reliable, subject only to human error. Law enforcement utilizes the PMP solely as an investigative tool.

## II. INVESTIGATION

### A. OVERVIEW

8. In and around October 2018, during the course of an FBI investigation into prescription and billing practices of a physician, law enforcement observed a regular patient of the

physician fill his prescription for oxycodone/acetaminophen and then conduct what appeared to be several hand-to-hand transactions in which he sold his pills to several unidentified customers. The patient, who will hereinafter be referred to as UCC-1 (uncharged co-conspirator #1), conducted the transactions at the home of one of his close relatives, UCC-2.

9. A review of PMP data revealed that UCC-1 was a regular patient of the physician, and received a prescription for oxycodone/acetaminophen every 28 days. Law enforcement thereafter conducted surveillance at the residences of UCC-1 and UCC-2, both located in Woodbridge, Virginia, in an effort to observe additional hand-to-hand drug transactions.

10. On or about January 29, 2019, while conducting surveillance in Woodbridge, Virginia, I observed a hand-to-hand transaction between UCC-1 and a woman who was subsequently identified as RAMIREZ. Immediately following this, local law enforcement initiated a traffic stop on the vehicle driven by RAMIREZ, at which point RAMIREZ was identified by her Virginia Driver's License. The passenger of the above-referenced vehicle was identified as a confidential witness (hereafter referred to as CW-1) for PWCPD. CW-1 later informed your affiant that RAMIREZ was providing cocaine to UCC-2 during the observed hand-to-hand transaction on January 29, 2019.

*CW-1*

11. In the course of the investigation, law enforcement identified an associate of RAMIREZ who was familiar with RAMIREZ's drug-trafficking activities. This associate became a confidential witness for law enforcement, and will hereinafter be referred to as CW-1. CW-1 admitted to law enforcement that he/she obtained prescription opioids from RAMIREZ and UCC-2 on a regular basis. CW-1 further advised law enforcement that RAMIREZ had provided cocaine

to UCC-1 during the hand-to-hand transaction on January 29, 2019. CW-1 told law enforcement that RAMIREZ's phone number was (xxx) xxx-0046.

12. Thereafter, CW-1, under the supervision of myself and other law-enforcement agents, conducted three separate controlled purchases of hydromorphone from RAMIREZ. All three purchase occurred in the Eastern District of Virginia. On these occasions, CW-1 directly purchased a total of 171 hydromorphone 4-mg tablets from RAMIREZ, as described in more detail in the section below. The information supplied by CW-1 has been corroborated to the extent possible by independent investigation, including but not limited to, physical surveillance, controlled purchases of controlled substances by CW-1 and others, audio recordings, reviews of prescription records, and subpoenaed documents.

*CW-2*

13. On or about February 27, 2019, law enforcement observed an unidentified individual conduct a hand-to-hand transaction with RAMIREZ. That individual became a confidential witness for law enforcement and will hereinafter be referred to as CW-2.[1] Law enforcement had previously observed CW-2 conduct a hand-to-hand drug transaction from UCC-1. When law enforcement approached CW-2 on February 27, 2019, CW-2 was found in possession of approximately 31 hydromorphone 4-mg tablets, which CW-2 admitted obtaining from RAMIREZ. CW-2 admitted that for multiple years, he/she had unlawfully purchased hydromorphone and oxycodone/acetaminophen tablets from RAMIREZ. CW-2 told law

1 Following the February 27, 2019, encounter with CW-2, a close family member of CW-2 was charged by the Commonwealth of Virginia for Possession of a Firearm During a Narcotics Transaction. CW-2 is cooperating with the instant investigation in hopes of receiving leniency for that family member.

enforcement that RAMIREZ's phone number was (xxx) xxx-0046, the same phone number that CW-1 provided for RAMIREZ. Law enforcement subsequently queried the phone number (xxx) xxx-0046 in law enforcement databases, and determined that the phone number was linked to RAMIREZ.

14. Thereafter, CW-2, under the supervision of myself and other law-enforcement agents, conducted two controlled purchases of hydromorphone from RAMIREZ. Both purchases occurred in the Eastern District of Virginia. On these occasions, CW-2 directly purchased a total of 80 hydromorphone 4-mg tablets from RAMIREZ, as described in more detail in the section below. The information supplied by CW-2 has been corroborated to the extent possible by independent investigation, including but not limited to, physical surveillance, controlled purchases of controlled substances, audio recordings, reviews of prescription records, and subpoenaed documents.

15. CW-1 and CW-2 both told law enforcement that, prior to cooperating with the FBI, they had been purchasing hydromorphone from RAMIREZ for approximately seven years.

16. PMP data indicates that from in and around January 3, 2014, to May 1, 2019, RAMIREZ filled prescriptions for more than 5,500 hydromorphone 4-mg tablets and more than 2,000 hydromorphone 2-mg tablets at pharmacies in Virginia. Based on my training and experience, and discussions with medical experts on substance abuse, this dosage amount is in excess of an amount for legitimate medical purpose in this time-frame.

**B. CONTROLLED PURCHASES OF HYDROMORPHONE**

15. As noted above, from in and around February to May 2019, law-enforcement agents conducted seven controlled purchases of hydromorphone 4-mg tablets totaling over 420

pills from RAMIREZ though the cooperation of CW-1 and CW-2. On each of these controlled purchases, the same general procedures were followed:

a. Prior to the controlled purchases, the CW's vehicle was checked to confirm the absence of contraband.

b. The CW was provided with government funds to make the controlled purchase and equipped with audio-recording and transmitting devices.

c. Physical and/or audio surveillance of the CW was maintained until the controlled purchases were completed.

d. After the controlled purchases were completed, law enforcement seized the purchased hydromorphone tablets, and again searched the CW and the CW's vehicle to confirm the absence of contraband.

*February 27, 2019 Controlled Purchase (CW-1)*

16. On or about February 27, 2019, RAMIREZ met with CW-1 at a pharmacy in Woodbridge, Virginia, to sell hydromorphone pills to CW-1. RAMIREZ was observed arriving to the meeting location in a van driven by an unidentified co-conspirator (UCC-3). RAMIREZ exited the van and walked inside the pharmacy with CW-1 to drop off RAMIREZ's prescription to be filled. CW-1, RAMIREZ, and UCC-3 then departed in UCC-3's van and drove to a nearby restaurant. Shortly thereafter, the three returned to the pharmacy, and CW-1 and RAMIREZ reentered the pharmacy to pick up the filled prescription. CW-1 and RAMIREZ then exited the pharmacy and got back into UCC-3's van. Inside the van, RAMIREZ confirmed that the cost was $200 for 20 pills. Ultimately, however, RAMIREZ gave CW-1 21 pills in exchange for $200.

17. A review of PMP data for RAMIREZ shows that on or about February 27, 2019, RAMIREZ filled a prescription for 180 hydromorphone 4-mg tablets. Law enforcement examined the pills seized from CW-1 and observed that they were 21 white, round pills etched with "M" on one side and "4" on the other. Based on my training and experience, pharmaceuticals — including Schedule II controlled substances like hydromorphone tablets — are imprinted, or etched/marked, with letters, numbers, or symbols to aid in identifying the substance(s) contained in the tablets.

18. A variety of resources are available both online and in print to persons seeking to determine the types of substance(s) contained in an otherwise unidentified tablet. One of these resources is an online pill-identifier tool that can be found on the website www.drugs.com. This pill identifier tool allows the user to enter a description of the tablet to include the shape, color, and imprint/etching in order to view photographs of the tablets and descriptions of the active ingredients in the tablets. I entered the descriptions of the tablets purchased on or about February 27, 2019 in the pill identifier tool and found that round tablets mentioned in paragraph 16 etched with "M," and "4" were each identified as being hydromorphone hydrochloride 4-mg tablets. I also viewed online photographs of hydromorphone 4-mg tablets on website www.WebMD.com and found the above etched pills were all consistent with hydromorphone 4-mg tablets.

*April 1, 2019 Controlled Purchases (CW-1 and CW-2)*

19. On or about March 30, 2019, CW-2 called RAMIREZ at RAMIREZ's phone number, (xxx) xxx-0046, to arrange to purchase a quantity of hydromorphone pills. During the recorded phone call, CW-2 asked RAMIREZ, "What time do you go Monday?" to which

RAMIREZ responded, "I just fill my script." CW-2 then responded, "I gotta see what I want to get. I gotta separate all my money." The next day, CW-2 called RAMIREZ again about the planned transaction. During the recorded conversation, CW-2 asked RAMIREZ, "Are we good for tomorrow?" to which RAMIREZ responded, "Yeah, how many?" CW-2 stated, "Fifty." RAMIREZ then responded, "Yeah, that's fine." That same day, CW-2 called RAMIEZ again. During the recorded conversation, CW-2 told RAMIREZ, "Whatever you do, hold on to those," to which RAMIREZ responded, "I got you. Yeah, I got you honey. No problem." CW-2 then told RAMIREZ, "Make sure you hold fifty for me," to which RAMIREZ responded, "Ok. Ok, I got you. Just call me in the morning."

20. On or about April 1, 2019, RAMIREZ met with CW-1 at 13214 Delaney Road, Woodbridge, Virginia 22193 (hereinafter "RAMIREZ's residence"). RAMIREZ and CW-1 departed the residence in CW-1's vehicle and drove to a pharmacy to fill RAMIREZ's prescription. After filling the prescription, RAMIREZ and CW-1 returned to RAMIREZ's residence. A review of PMP data for RAMIREZ shows that on April 1, 2019, RAMIREZ filled a prescription for 180 hydromorphone 4-mg tablets.

21. While inside RAMIREZ's residence, CW-1's audio recording device captured RAMIREZ saying, "Count forty of these…" Ultimately, RAMIREZ sold CW-1 40 pills in exchange for $400. Law enforcement examined the pills seized from CW-1 and observed that they were 40 white, round pills etched with "M" on one side and "4" on the other, consistent with hydromorphone, as described above.

22. Thereafter, also on or about April 1, RAMIREZ met with CW-2 at the curb directly in front of RAMIREZ's residence to sell hydromorphone pills to CW-2. RAMIREZ

entered the passenger's side of CW-2's vehicle. While in CW-2's vehicle, RAMIREZ told CW-2, 'It should be fifty." CW-2 responded that there were not 50 pills present. Following this, RAMIREZ counted the pills and then exclaimed, "Fifty!" Ultimately, RAMIERZ sold CW-2 50 pills in exchange for $500. Law enforcement examined the pills seized from CW-2 and observed that they were 50 white, round pills etched with "M" on one side and "4" on the other, consistent with hydromorphone, as described above.

*May 1, 2019 Controlled Purchases (CW-1 and CW-2)*

23. On April 29, 2019, CW-1 called RAMIREZ at (xxx) xxx-0046 to arrange a purchase of a quantity of hydromorphone pills. During the recorded conversation, RAMIREZ stated, "I have a hundred I need to get rid of, please." Prior to this phone call, CW-1 informed law enforcement that CW-1 had told RAMIREZ that CW-1 would purchase additional pills for an unnamed female friend. CW-1 advised law enforcement that CW-1 had told RAMIREZ this to explain why CW-1 would be purchasing significantly more pills than CW-1 had purchased in the past. In the phone call on April 29, RAMIREZ further stated, "After, like, every month, you know, we can do that." Based on my experience and knowledge of this investigation, I understand this to be in reference to RAMIREZ selling hydromorphone pills to the unknown buyer, by way of CW-1, every month.

24. On or about May 1, 2019, CW-1 met RAMIREZ inside RAMIREZ's residence to sell hydromorphone pills to CW-1. While inside RAMIREZ's residence, CW-1's audio recording device captured RAMIREZ counting out the pills in twos, then RAMIREZ tells CW-1 to "do 'em in tens" when counting the pills. Ultimately, RAMIREZ sold CW-1 100 pills in exchange for $1,100.

25. A review of PMP data for RAMIREZ shows that on May 1, 2019, RAMIREZ filled a prescription for 180 hydromorphone 4-mg tablets. Law enforcement examined the pills seized from CW-1 on May 1, 2019, and observed that they were one hundred ten yellow, round pills etched with "P" on one side and "4" on the other. I entered the descriptions of these tablets in the pill-identifier tool found on the www.drugs.com and www.WebMD.com websites and determined the tablets mentioned in paragraph 23 etched with "P" and "4" were identified as being hydromorphone 4-mg tablets.

26. On April 29, 2019, CW-2 called RAMIREZ at RAMIREZ's phone number, (xxx) xxx-0046, to arrange to purchase a quantity of hydromorphone pills. During the recorded phone call, CW-2 asked RAMIREZ, "What time do you go Wednesday?" to which RAMIREZ responded, "8:30. Yeah, I'm the first patient." CW-2 then asked RAMIREZ, "What time do you think you'll be out of there?" to which RAMIREZ responded, "I'm the first patient so I should be out of there probably very, very fast. Very fast." Later that day, CW-2 called RAMIREZ again about the planned transaction. During the recorded conversation, RAMIREZ said, "Can you like call me tonight because I have somebody that wants the rest, that's why I'm trying to figure things out." Later that day, CW-2 called RAMIREZ again to follow up. During the recorded conversation, CW-2 told RAMIREZ, "Hold on to thirty of them for me," to which RAMIREZ responded, "Ok. That's all?" CW-2 then said, "Yeah. That's all I can afford. I can't afford that," to which RAMIREZ responded, "Alright. Sounds good."

27. On or about May 1, 2019, RAMIREZ met with CW-2 to sell hydromorphone pills to CW-2. During that transaction, RAMIREZ and CW-2 met at the curb directly in front of RAMIREZ's residence. Upon arriving, RAMIREZ exited a green Jeep (hereinafter

"RAMIREZ's vehicle") and immediately entered the passenger side of CW-2's vehicle. While inside CW-2's vehicle, law enforcement visually observed and heard RAMIREZ counting out the pills in twos and confirming that CW-2 wants thirty pills. RAMIREZ then told CW-2 that she will have about twelve pills left after selling one hundred ten pills to "somebody far away," and further stated that "I don't meet her, I don't talk to her, I have somebody else do it."

28. Ultimately, RAMIREZ sold CW-2 30 pills in exchange for $300. Law enforcement examined the pills seized from CW-2 and observed that they were thirty yellow, round pills etched with "P" on one side and "4" on the other, consistent with hydromorphone, as described above. A review of PMP data for RAMIREZ shows that on May 1, 2019, RAMIREZ filled a prescription for 180 hydromorphone 4-mg tablets.

*May 29, 2019 Controlled Purchases (CW-1 and CW-2)*

29. On May 12, 2019, CW-1 called RAMIREZ at (xxx) xxx-0046 to arrange a purchase of a quantity of hydromorphone pills. During the recorded conversation reviewed by your affiant, when asked by CW-1 how many pills RAMIREZ wanted to sell, RAMIREZ said, "All of 'em, one-hundred eighty." RAMIREZ asked CW-1 to tell the unknown buyer (the fictional female friend that CW-1 told RAMIREZ about), "Just tell her that's the way I pay my bills."

30. On May 14, 2019, CW-2 called RAMIREZ at (xxx) xxx-0046 to arrange a purchase of a quantity of hydromorphone pills. During the recorded conversation, CW-2 told RAMIREZ, "I just wanted to remind you, man, at the beginning of the month, don't forget me," to which RAMIREZ responded, "29th." CW-2 replied, "29th?" to which RAMIREZ responded, "I only got thirty. I only got thirty left." CW-2 then asked, "That's it?" to which RAMIREZ

responded, “Yeah, that’s it.” CW-2 then told RAMIREZ, “Well hang on to ‘em,” to which RAMIREZ responded, “Ok. Just for you.” CW-2 then stated to RAMIREZ, “Just gimme a call and we’ll figure something out,” to which RAMIREZ responded, “Yeah. I already got the script” [prescription]. Later during the same phone call, RAMIREZ asked CW-2, “Did you like the yellow ones better than the white ones?” to which CW-2 responded, “Yeah. I think so.” RAMIREZ asked, “You did?” followed by, “They’re more expensive.” Later during the same phone call, RAMIREZ said, “Yeah. I paid forty-something for them at CVS. But they’re so fast at CVS,” to which CW-2 responded, “You gotta be kidding. CVS is like the slowest place to go, I think.” RAMIREZ responded, “No. Not at Tackett’s Mill.” A review of PMP data revealed that RAMIREZ filled a prescription for 180 hydromorphone 4-mg tablets at the CVS pharmacy located in 2200 Tackett’s Mill Drive in Woodbridge.

31. On or about May 29, 2019, RAMIREZ met with CW-1 to sell hydromorphone pills to CW-1. During that transaction, RAMIREZ and CW-1 met inside the bathroom of a Safeway located in Dale City, Virginia. Ultimately, RAMIREZ sold CW-1 150 pills in exchange for $1,500. Law enforcement examined the pills seized from CW-1 and observed that they were one hundred fifty white, round pills etched with “M” on one side and “4” on the other, consistent with hydromorphone, as described above.

32. On or about May 29, 2019, RAMIREZ met with CW-2 to sell hydromorphone pills to CW-2. During that transaction, RAMIREZ and CW-2 met at a Lowe’s Home Improvement located in Woodbridge, Virginia. Upon arrival, CW-2 entered the passenger side of RAMIREZ’s vehicle. Inside the vehicle, RAMIREZ sold CW-2 30 pills in exchange for $300. Law enforcement examined the pills seized from CW-2 and observed that they were thirty

white, round pills etched with "M" on one side and "4" on the other, consistent with hydromorphone, as described above.

## III. CONCLUSION

33. Based upon the foregoing, there is probable cause to believe that, within the Eastern District of Virginia and elsewhere, LISA DAWN RAMIREZ, knowingly, unlawfully, and intentionally combined, conspired, confederated, and agreed with others to distribute hydromorphone, a Schedule II controlled substance in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Respectfully submitted,

Jason Coe
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me this 30 day of May, 2019.

/s/
Michael S. Nachmanoff
United States Magistrate Judge

The Honorable Michael S. Nachmanoff
United States Magistrate Judge